UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Hernando Lopez
a/k/a Fernando Franco-Lopez,

        Plaintiff,                CV-03-1729 (CPS)

   - against -             MEMORANDUM OPINION
                                AND ORDER

United States of America

        Defendant.

----------------------------------------X

SIFTON, Senior Judge.


      Plaintiff Hernando Lopez brings this action against

defendant United States of America pursuant to the Federal Torts

Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.,* seeking to recover

damages against the defendant for failure to diagnose and treat

plaintiff's symptoms of laryngeal/glottic (vocal cord) cancer

during a period of his incarceration from June 2000 until his

discharge by the Federal Bureau of Prisons on March 1, 2002.  The

matter was tried before the undersigned sitting without a jury

between March 28, 2005 and April 6, 2005.[1]  For the reasons set

---

    [1]  Plaintiff's complaint also named the following defendants: United
States Department of Justice, Federal Bureau of Prisons, Federal Correctional
Institution, Fort Dix, NJ, "John Does Nos. 1-10," Federal Correctional
Institution, Allenwood, Pa., "John Does Nos. 11-20," Federal Correctional
Institution, Loretto, Pa, Warden Bobby Shearin, J. Trimbath, "John Does Nos.
21-30," the Federal Detention Center, Oakdale, La., Warden Martha L. Jordan
and "John Does Nos. 31-40."  Plaintiff also made claims for relief pursuant
to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S.
388, 397 (1971) for deliberate indifference to plaintiff's need for medical
care in violation of the Eighth Amendment.  On February 17, 2004, the
plaintiff and defendants stipulated to dismiss all *Bivens* claims.  During the
pre-trial conference before this Court on March 15, 2005, the plaintiff agreed
to dismiss the remaining FTCA claims against all defendants except the United

forth below, plaintiff is entitled to recover damages from the defendant in the total amount of $1,156,149. What follows sets forth the findings of fact and conclusions of law on which this decision is based as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## Background

Plaintiff Hernando Lopez was at the time of trial forty-eight (48) years old and resided with his mother, sister and his sister's two children in Queens County, New York. (Pl. Ex. 42 at 7-8).[2] Lopez was born in Medellin, Columbia and entered the United States in 1979. (Def. Ex. O at 51-52). His native language is Spanish, and he cannot converse fluently in English. (Pl. 42 at 8).

Lopez was convicted of separate conspiracies to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846 in the United States District Court for the Southern District of Florida on December 1, 1993, and in the United States District Court for the Eastern District of Virginia on September 8, 1995. As a result of these convictions, Lopez was incarcerated and in

---

States of America.

[2] Because of plaintiff's condition at the time of trial, he presented his testimony in the form of a videotape, *de bene esse,* and a written transcript of the video testimony. Both the videotape and the written transcript were admitted into evidence as Plaintiff's Ex. 42.

the custody and under the control of the United States of

America's Bureau of Prisons (hereinafter "BOP") from June 1993

through March 1, 2002. (Pl. Ex. 44, Def. Ex. D., BOP 386-87).[3]

The principal events relevant to this case began during

the latter half of 2000 and continued through Lopez's release by

the BOP on March 1, 2002.  During this period, Lopez was

incarcerated in three different BOP facilities: (1) the Federal

Correctional Institute in Loretto, Pennsylvania (FCI Loretto)

from April 18, 2000 to June 1, 2001; (2) the Federal Transfer

Center in Oklahoma (FTC Oklahoma) from June 12, 2001 to July 3,

2001; and (3) the Federal Detention Center in Oakdale, Louisiana

(FDC Oakdale) from July 3, 2001 to March 1, 2002, after which he

was scheduled to be deported. (BOP 55, 31, 29, 27, 22, 2; Def.

Ex. P1, P2).[4]  During the term of his imprisonment, plaintiff

completed 40 hours of drug education, earned various certificates

of achievement and became and artist and painter, producing over

thirty works of art. (Pl. Ex. 1-7).

Lopez's relevant medical history before the latter half

---

[3] Plaintiff Exhibit 44 and Defendant Exhibit D are largely duplicative.
Both consists of a complete set of BOP medical records, and include BOP
documents Bates stamped "BOP 1-804." For ease of reference, portions of these
exhibits are identified by their Bates stamp number.

[4] Plaintiff was also briefly detained in Lewisberg, Pennsylvania from
June 1, 2001 to June 12, 2001. (Pl. Ex. 44).

of 2000 includes a surgical septoplasty,[5] performed in December
1998 at the Otolaryngology Clinic at West Jersey Hospital,
Camden, New Jersey.  The procedure repaired a nasal fracture and
deviated septum, caused by an inmate assault while Lopez was
incarcerated at the Federal Correctional Institute in Fort Dix,
New Jersey. (BOP 292, 380).

Events at FCI Loretto, Pennsylvania

Lopez was incarcerated at FCI Loretto from May 1999
through June 2001.  In June 2000, Lopez began complaining to
prison medical personnel about nasal blockage and breathing
problems, which Lopez himself attributed to his 1998 septoplasty.
(BOP 328, 329, 333, 335, 330).  Lopez was examined by various
physician's assistants (hereinafter "PAs") in regard to these
nasal and breathing complaints. (BOP 295, 29, 71).[6]  Physician's
assistants are primary care providers who work under the

---

[5] A "septoplasty" is an operation to remove a physical obstruction, such
as a deflection of cartilage, that is blocking the flow of air through the
nose. (Tr. 388)

[6] The encounters between BOP medical personnel and the plaintiff were
recorded in the "SOAP" format, a method commonly used by physicians to
document components of an encounter with a patient.  (Tr. 64-65). "S" stands
for the patient's subjective complaints, which are recorded by the care
provider.  "O" signifies the objective information used by the provider to
assess the subjective part of the patient's complaint or history, such as
vital signs, blood pressure, results of a physical exam.  This also includes
any diagnostic tests that are required such as blood tests, x-rays or
specialty tests.  "A" stands for assessment, under which the provider uses the
subjective and objective components as the basis for a differential diagnosis,
a set of possibilities that could pertain to the plaintiff's symptoms. "P"
sets forth the plan, both therapeutic and diagnostic; i.e. a treatment plan
for the diagnosis or group of diagnoses that the physician thinks are relevant
to the patient and should conform to the standard of care. (*Id.*)

supervision of a physician. (Trial Transcript "Tr." 65-66).

On July 6, 2000, Lopez submitted an "Inmate Request to Staff" asking to "see a specialist A.S.A.P." for his breathing difficulties, which Lopez continued to attribute to his 1998 septoplasty procedure. (BOP 330). In a response dated July 17, 2000, J. Trimbath, Health Services Administrator of FCI Loretto, denied the request, stating that "there was no clinical indication" that a specialist was necessary (BOP 331). On August 28, 2000, Lopez appealed this decision to Warden Bobby Shearin, who denied Lopez's request on October 6, 2000. (BOP 332, 321).

In September 2000, Lopez complained repeatedly about problems related to his throat and voice, specifically, about hoarseness and sore throat. On September 22, 2000, Lopez submitted an "Inmate Sick Call Sign Up Sheet," complaining of "problems with [his] glands" and not being able to "speak clear[ly]". (BOP 306). He was seen on the same day by PA Tyger, who observed Lopez to have "throat red" and mild "laryngitis" (or hoarseness). (BOP 44). On October 6, 2000, Lopez complained of throat-related problems. (BOP 320). He was seen that same day by PA Middlekauff for "ongoing c/o [complaints of] sore, irritated throat," which had been previously treated with Penicillin but provided "little relief." (BOP 46). PA Middlekauff observed that Lopez had an "injected," or red and inflamed, throat, and made an

assessment of "recurrent pharyngitis," for which he prescribed a different antibiotic, Erythromycen. (BOP 46, Tr. 97). On October 16, 2000, Lopez submitted another Inmate Sick-Call Sign-Up Sheet, stating "I have infection bacterial in my nose and throat ...Flame, difficulty to speak." (BOP 319). On October 17, 2000, Lopez was seen by PA Middlekauff, who noted Lopez's ongoing complaints of "sore irritated throat," his "requests to see an ENT specialist," and that "he continues to have hoarseness." (BOP 26). PA Middlekauff ordered another throat culture and discontinued antibiotics. (BOP 26). On October 20, 2000, Lopez was seen again by PA Middlekauff, who performed a follow-up throat culture, which resulted in a "heavy growth of E-Coli." (BOP 25).[7] Lopez was prescribed another antibiotic, Bacterim. (BOP 25).

On November 7, 2000, Lopez submitted another Inmate Sick Call Sign-Up Sheet, citing "infection from my nose and my throat...many flame." (BOP 317). He was examined the same day by PA Middlekauff, who observed Lopez's "sore throat," and injected pharynx (back of the throat), and another culture of the throat was done. (BOP 53). On November 17, 2000, during another examination, PA Middlekauff recorded Lopez's complaints of "ongoing throat irritation and inability to speak well...harsh

---

[7] "E-coli" is a bacteria which commonly resides in the lower digestive or urinary tract. (Tr. 109).

voice." (BOP 51). PA Middlekauff noted that the reculture performed the previous week grew slight staph aureus, a type of organism that can cause infection, and prescribed a course of the antibiotic Bactrim. (BOP 51). Lopez was examined again on December 1, 2000, where he reported continued throat irritation and no relief from the Bactrim. (BOP 52). PA Middlekauff observed that Lopez had an inflamed pharynx and enlarged tonsils; he made an assessment of "recurrent pharyngitis" and performed another throat culture. (BOP 52). Lopez was seen for a follow up exam on December 11, 2000, during which he complained that he "continues to have harsh voice, sore throat." (BOP 50). Lopez was prescribed another antibiotic, Ciprofloxin, for a period of ten days followed by gargling with hydrogen peroxide. PA Middlekauff wrote "consult to MD," meaning that the PA had to confer with the supervising physician of record. (BOP 50).

On January 23, 2001, Lopez was examined by J. Shim, Medical Officer, for "hoarseness for 3 months" and "still sore throat." (BOP 41). Dr. Shim made an assessment of "hoarseness" and "dry cough" and prescribed another antibiotic, Flagyl and recommended a follow-up be done by Dr. Daniel Leonard, M.D., the Clinical Director at FCI Loretto. (BOP 41). On February 16, 2001, Lopez was examined by PA Middlekauff for ongoing complaints of "dry, scratchy throat," which had not been resolved by repeated courses of antibiotics. The PA observed Lopez's red

throat with enlarged tonsils, made an assessment of "dry, scratchy throat," and performed another throat culture. (BOP 39). Lopez was seen again on February 21, 2001 by the Clinical Director, Dr. Leonard, for complaints of "sore throat," and Dr. Leonard observed that the "throat appears normal." (BOP 37,38,40). On March 7, 2001, PA Middlekauff made an assessment that Lopez had a "raspy throat." (BOP 36).

On April 12, 2001, Lopez submitted a written request to Warden Bobby Shearin, asking to be evaluated by an ENT (ear, nose, and throat) specialist and stating that Lopez's "family will be making arrangements to pay all expenses necessary to have that evaluation." (BOP 422). In that request, Lopez stated that he was "having a lot of difficulties speaking because of [his] problems with the ear, nose and throat," problems which he continued to attribute to the 1998 septoplasty. (BOP 422). This request was denied in an unsigned memorandum from FCI-Loretto dated April 17, 2001, citing a general policy against granting this kind of request in the absence of "very unusual circumstances," and stating that Lopez's condition was not considered to be "very unusual." (BOP 421). During an exam on May 30, 2001, Dr. Leonard noted that Lopez was complaining of a "sore throat." (BOP 31).[8] On June 1, 2001, Lopez was transferred

_____

[8] In late May 2001, Lopez attempted to bring an action in the United States District Court for the Western District of Pennsylvania. Lopez filed the action *in forma pauperis* seeking equitable relief directing the BOP to

from FCI Loretto to the United States Penitentiary in Lewisberg, Pennsylvania.

### Events at FTC-Oklahoma

Eleven days later, on June 12, 2001, Lopez was again transferred from USP Lewisberg to the Federal Transfer Center (FTC) in Oklahoma.  Lopez was incarcerated at FTC Oklahoma from June 12, 2001 to July 3, 2001.  On June 15, 2001, Lopez received an intake medical examination at Oakdale by PA C. Wallace, who noted that Lopez had complained of hoarseness for "several months." (BOP 27, 28).  PA Wallace also noted Lopez's previous history of E.Coli throat cultures and observed that the Lopez's voice was "hoarse."  The PA's assessment was that Lopez had "persistent pharyngitis and hoarseness," and Lopez was given antibiotics and told to gargle with a Peridex oral rinse.  At the time of the intake examination, the medical personnel at the Oklahoma facility had not yet received Lopez's medical records from the Pennsylvania facilities.  A follow-up exam at the patient's next destination was recommended. (BOP 28, Tr. 133). Lopez was transferred from FCI Oklahoma to FDC Oakdale, Louisiana on July 3, 2001.

### Events at FDC Oakdale, Louisiana

Lopez was incarcerated at the Federal Detention Center in

---

provide him with the care of a specialist.  Lopez was denied *in forma pauperis* status, and the complaint was never served on a defendant.

Oakdale, Louisiana from July 3, 2001 until his release on March 1, 2002.  On July 18, 2001, when working in the kitchen, Lopez was sent to the hospital by PA Daniels for breathing problems. During the physical exam, Nurse Tammy Rodriguez made a notation that Lopez's "voice is hoarse." (BOP 23).  On August 8, 2001, Lopez submitted a written request to Dr. Joel Alexander, the Medical Director of FDC Oakdale, asking to see a specialist because he believed that his 1998 septoplasty was causing breathing problems as well as affecting "his throat and ears." (BOP 439).  On August 9, 2001, he was examined by PA Bergenholz for complaints of "sore throat," although his pharynx was observed to be clear. (BOP 21).  On August 21, 2001, Lopez was examined by Dr. Blocker, MD, Staff Physician, who observed that Lopez's "voice is raspy" and that Lopez "requests to be seen by specialist." (BOP 18).

On September 18, 2001, Lopez was seen by Dr. Blocker for a follow-up examination during which Lopez reported "continual problems of breathing and voice."  Dr. Blocker observed Lopez's voice to be unchanged from the previous visit, and noted "complaint of voice changes." (BOP 16).  Dr. Blocker also wrote "consider ENT evaluation for complaints of nasal problems and voice changes." (BOP 16).  On September 18, 2001, Dr. Blocker made a request for an ENT consultation, citing as reasons for the request "history of nasal septoplasty and

difficulty breathing. Complains of return of symptoms." (BOP 576). On September 28, 2001, Dr. Joel Alexander, the Clinical Director of FDC Oakdale, examined Lopez and noted that Lopez had a history of nasal congestion and that he suffered from a "possible vocal chord dysfunction." (BOP 14). On October 15, 2001, Lopez was examined for complaints that his "throat hurt," and PA Bergenholz noted again that Lopez suffered from a "possible vocal chord dysfunction." (BOP 12).

On October 24, 2001, Lopez was examined outside of FCI Oakdale by an ENT specialist, Leslie Warshaw, Jr., who was not employed by the Bureau of Prisons. (BOP 576). At the time, Dr. Warshaw ran an outpatient clinic in Oakdale, where he saw prisoners on routine consult from FDC Oakdale every other Tuesday, and does approximately 2-4 prison consults per month. (Tr. 545). Dr. Warshaw testified that the only information he receives from the prison when doing a prisoner consultation is the information written on the top half of a consult sheet, which accompanies the prisoner to the clinic. No medical records from the prison accompany the patient. (Tr. 547). After conducting the exam, the specialist makes his recommendation on the bottom half of the consult sheet. (Tr. 547). The consult sheet which accompanied Lopez for the October 24, 2001 ENT examination carried only the following information from BOP medical staff: "history of nasal septoplasty and difficulty breathing.

Complains of return of symptoms." (BOP 576). The top half of the consult sheet did not make reference to Lopez's voice problems or the "possible vocal cord dysfunction," which Dr. Alexander had noted during the previous examination.

During the examination, Dr. Warshaw noted that Lopez complained of "fluid draining down throat, 'brain trouble' can't talk, swallowing difficulties." (BOP 576). Dr. Warshaw testified that he remembered Lopez's voice being "husky," but he thought it was due to chronic nasal congestion and post nasal drip. (Tr. 555). Dr. Warshaw also testified that Lopez told him he couldn't talk and had swallowing difficulties over the last several months. (Tr. 594). Dr. Warshaw recommended a CT scan of the sinuses to be arranged by the BOP. Although the specialist can make a recommendation, the prison has to schedule and make arrangements for further diagnostic testing and procedures. (Tr. 550). Dr. Warshaw asked Lopez to return for a follow-up exam after the CT scan had been obtained. (Tr. 550).

Dr. Warshaw's ENT examination that day did not include an examination of the larynx. An ENT examines the larynx in one of two ways: (1) by performing an indirect laryngoscopy, in which the ENT places a small mirror at the back of the throat and indirectly views the vocal cord, or (2) a flexible laryngoscopy, in which the ENT inserts a fiberoptic larygnoscope, a tube with a light source, lens, and viewer, into the patient so that the

vocal cords can be directly inspected. (Tr. 108-109). Dr. Warshaw testified that on the particular day Lopez was examined, the flexible laryngoscope in his office was broken, and that he couldn't proceed with the mirror because of Lopez's gag reflex. (Tr. 593). Dr. Warsaw also testified that because the prison medical staff listed only Lopez's nasal issues on the top portion of the consult sheet, he had not planned on looking at Lopez's larynx during that examination. (Tr. 593). Dr. Warshaw testified that if the consult sheet had indicated that Lopez had complained of several months of hoarseness, he would have ordered a laryngoscopy to view Lopez's vocal cords. (Tr. 594).

The CT scan of the sinuses recommended by Dr. Warshaw was taken two months later on December 13, 2001. (BOP 680). During the two month interval between Dr. Warshaw's exam and the CT scan, Lopez continued to complain of a sore throat and hoarseness. On November 8, 2001, Lopez was examined for repeated complaints of "throat, chronic ho[a]rsness." (BOP 13). He was observed to have whitish plaque in his throat. (BOP 13). On November 31, 2001, Dr. Blocker examined Lopez for repeated complaints of "voice changes and throat pain." (BOP 11). On December 7, 2001, a medical examiner made an assessment that Lopez was a "chronic dysphonic."[9] (BOP 10). On December 13, 2001, Lopez was admitted to Oakdale Community Hospital for a CT

---

[9] "Dysphonia" refers to change in the pitch or tone of voice. (Tr. 151).

scan of the sinuses, which was negative. (BOP 680). On December
18, 2001, Dr. Blocker saw Lopez for an exam following the ENT
consult and the CT Scan. Dr. Blocker noted that Lopez's speech
was "whispered," and he made an assessment of "voice changes."
(BOP 9). On January 15, 2002, P.A. Daniels noted that Lopez
would return to the ENT specialist. (BOP 7).

On January 22, 2002, Lopez was examined again by Dr.
Warshaw. Dr. Warshaw testified that during this exam, he noticed
definite changes in Lopez's vocal characteristics. (Tr. 559).
Dr. Warshaw passed a flexible scope down Lopez's nose, and
observed a lesion on his larynx, which he recorded as a "possible
T1, T2 squamous cell carcinoma of the larynx."[10] (BOP 574, Tr.
566). Dr. Warshaw also observed leukoplacia, which is a white
scaly looking tissue, on the left vocal cord. Dr. Warshaw
recommended a biopsy in order to properly diagnose the lesion.
Dr. Warshaw testified that his office called the prison the next
day, to inform prison medical staff that a biopsy needed to be
scheduled. Dr. Warshaw's office requested that the prison
schedule the biopsy the next week. (Tr. 611).

On February 6, 2002, Dr. Warshaw performed a
panendoscopy and laser biopsy at Rapides General Hospital in

---

[10] A "squamous cell" is a normal cell which acts as a lining, and is
found in different parts of the body, including the skin surfaces, the
gastrointestinal tract and the upper airway. "Squamous cell carcinoma" is a
malignant cancer, which has all the features or appearances of a normal
squamous cell, and is the most common kind of laryngeal cancer. (Tr. 255-56).

Alexandria, LA.  Dr. Warshaw discovered a "large mass lesion in the anterior two-thirds of the right true vocal cord extending into the ventricle..." (Pl. Ex. 47, Document 1372).  Dr. Warshaw "debulked," or removed as much of the lesion as possible with forceps, and then used a carbon dioxide laser to remove the remaining visual evidence of the tumor. (Tr. 573-74).  Dr. Warshaw's post-operative diagnosis was Squamous Cell Carcinoma (SCCA) of the larynx, which he staged as T2 N0 M0.[11] (*Id.*).

Cancers are "staged" according to the American Joint Commission on Cancer (AJCC) handbook, an accepted authority within the medical profession that attempts to standardize the terminology and the treatment of cancers in this country. (Tr. 343, 344, 378, 654, 789; Def. Ex. J).  Staging a cancer helps identify how successful particular treatment options might be. (Tr. 405).  The "T" records a staging of the tumor.  "N" records whether cancer has spread to the lymph nodes, and "M" records whether the cancer has metastasized, i.e. spread to a different part of the body, such as the lung.  The T stage is subdivided into T-1 to T-4, with T-4 being the most advanced of the invasive cancers, and T-1 being the least advanced of the invasive

---

[11] Clinical staging, which is done by a physician, differs from pathologic staging, which requires pathological analysis of tissue that has been removed form the patient. In a clinical staging, a physician, uses all available information, short of taking out tissue, to determine a cancer's stage.  Available information includes the medical history, the physical findings such as what is observed with a scope or mirror, and other ancillary tests such as CT scans and MRIs. (Tr. 378-379).

cancers.  T-2 indicates that the tumor involves areas extrinsic

or adjacent to the vocal cord as well as the vocal cord.

Usually, it also involves some limitation on the motion of the

vocal cord. (Tr 410).  T-3 involves paralysis of the vocal cord

or invasion of the cartilage, which can be seen on an x-ray.  By

adding up the T, N, and M categories, a treating physician puts

the cancer in a particular stage.

Dr. Warshaw staged Lopez's cancer as a Stage II cancer.

The parties dispute whether Dr. Warshaw properly staged the

cancer as T2 (Stage II).  As previously discussed, a cancer is

staged as T-3 only if there is paralysis of the vocal cord or

invasion of the cartilage.  After considering the evidence, I am

persuaded that there was no vocal cord immobility or cartilage

invasion, and thus, Lopez's cancer was properly staged as T2

(Stage II).  Although in his operative report, Dr. Warshaw noted

"non-movement of the right vocal cord" (Def. Ex. D-"Document

1372"),[12] he testified at trial that the notation was a dictation

or transcription error because he specifically remembered

movement of Lopez's right vocal cord.  (Tr. 576).  Subsequent

procedures performed by physicians at Elmhurst hospital also

demonstrated that Lopez's vocal cords were mobile.  (Pl. Ex. 49,

---

[12] Although Pl. Ex. 44 and Def. Ex. D are duplicative copies of Lopez's medical record, Pl. Ex. 44 includes documents from Rapides Medical Center, Elmhurst Hospital, and other treating hospitals which have do not have Bates stamp numbers or any other identifying number which facilities reference to these documents.  Thus, when referring to these documents, I will use the Bates stamp number that identifies them in Def. Ex. D.

Def. Ex. D–"Document 778" and "Document 776").

Moreover, in regard to the issue of cartilage invasion, the official report by the Radiology Department of Oakdale, which accompanied the February 2002 CT scan taken at Oakdale Hospital, stated "bony structures intact," meaning that the scan was not read by Oakdale radiologists as showing cartilage invasion. (BOP 795). A report accompanying the March 2002 CT scan taken at Elmhurst Hospital states that "there is a slight irregularity involving medial aspect of the thyroid cartilage posteriorly suggesting possible invasion." (Tr. 452, Pl. Ex. 49, Def. Ex. D "Document 335"). While Dr. Richard Fabian,[13] plaintiff's head and neck cancer expert, interpreted this scan as showing definite cartilage invasion (Tr. 422), defendant's head and neck cancer expert, Dr. Kraus, testified that this scan did not indicate cartilage destruction anywhere near the tumor. Dr. Kraus stated that a breach in cartilage, were it to occur, would occur near the tumor. (Tr. 805). In this case, plaintiff's tumor was located on the anterior part of the vocal cord. Thus, the March 2002 CT scan's identification of possible "posterior" invasion suggests that cartilage invasion occurred on the other end of the vocal cord from where the tumor is located. Given the

---

[13] Prior to Dr. Fabian's retirement in 2004, he was the Director of Head and Neck Cancer Surgery at Massachusetts General Hospital and Massachusetts Eye and Ear Infirmary, a position he held since 1986. He was also an associated professor in otolaryngology at Harvard Medical School. (Tr. 361).

unlikeliness of such an occurrence, I am persuaded by Dr. Kraus's testimony that the indication of "possible invasion" on the March 2002 CT scan was likely due to a distortion of the radiological image. (Tr. 525, 527).

Defendant also offered the testimony of Dr. Margaret Brandwein-Gensler,[14] a pathology expert, who opined within a reasonable degree of medical certainly that the pathology slides revealed no invasion of the thyroid cartilage. She testified that while in certain places, the cancer came near the thyroid cartilage, there was no actual infiltration of the thyroid cartilage. (Tr. 678-686). Dr. Gensler's findings are also supported by the February 6, 2002 Surgical Pathology Reports from Oakdale Hospital and the March 12, 2002 Surgical Pathology Report from Elmhurst Hospital, which did not identify any cartilage invasion. (BOP 796-97, Def. Ex. D. "Document 353-54"). Given the weight of evidence, I am persuaded by the testimony of Dr. Kraus and Dr. Gensler. As there was no vocal cord immobility or cartilage invasion, I find that Lopez's cancer was properly staged by Dr. Warshaw in February 2002 as T2 (Stage 2) glottic cancer.

At Dr. Warshaw's recommendation, Dr. Alexander, the Clinical Director of FDC Oakdale, ordered a CT-Scan of neck and

---

[14] At the time of trial, Dr. Gensler was the Chief of ENT Pathology at Montefiore Medical Center, and a professor in both the Pathology and ENT Departments at Albert Einstein College of Medicine. Prior to this appointment, she was Chief of ENT Pathology at Mount Sinai Medical Center. (Tr. 635)

larynx, which was performed at Oakdale Community Hospital on
February 20, 2002. Following his diagnosis, Dr. Alexander called
Lopez into his office and presented him with two options for
treatment: (1) he could remain in the custody of the BOP for
treatment in Louisiana, or (2) he could be sent home for
treatment at the end of his incarceration. (Pl. Ex. 42 at 50-
52). Lopez, who was two weeks away from the end of his
incarceration at the time, testified in his video testimony *de
bene esse* that Dr. Alexander recommended him to take the second
option "so that [he] could be with [his] family and could die in
peace." (*Id.*).[15]

Lopez also testified that he was a nonsmoker. (Pl. Ex.
42 at 8). The BOP medical records during the relevant time
period in this case, June 2000 to March 2002, do not include any
notation by examining physicians or physician assistants as to
whether Lopez was or was not a smoker, indicating either that he
was not asked this question or that his answer was unrecorded. A
patient's history of smoking is an important piece of information
for medical personnel in determining whether a patient is in a
"higher risk group" for developing laryngeal cancer. (Tr. 502).
Defendant, in its post-trial submissions, suggests that Lopez
made several active representations to the BOP medical staff that

---

[15] Although defendant indicated at the pretrial conference that Dr.
Alexander would be called as a fact witness, defendant did not produce this
witness at trial.

he was a non-smoker, citing the following documents as evidence:
BOP 83, 458, 462, 475, and 480.  While BOP 83, a document dated
May 14, 1999 signed by PA Middlekauff contains a notation that
Lopez is a "nonsmoker," the remaining documents, all of which are
titled "Medical History Report," do not appear to refer to
cigarette or tobacco use.[16]  At trial, defendant introduced
receipts of cigarette purchases made by Lopez during his
incarceration (Def. Ex. O).  In order to rebut this evidence,
plaintiff intended to call one of Lopez's friends from prison who
would testify that Lopez did not smoke and instead, used the
cigarettes as currency in the prison.  However, in the interest
of time, I stated that extensive evidence on the issue was not
necessary because such an inference could be drawn without
witness testimony. (Tr. 928).  Lopez was released from prison on
March 1, 2002.

### Cancer's Earliest Presence

The parties dispute how early Lopez's cancer was present
prior to diagnosis.  Dr. Andrew Eric Rosenberg,[17] plaintiff's
pathology expert, provided testimony based on his review of
approximately 40 pathology slides from the Histopathologic

---

[16]  During interviews with physicians at Elmhurst Hospital in New York
after his release from prison, Lopez stated that he used to be a "social
smoker" but had not smoked in fifteen years.  (Tr. 400; Pl. Ex. 44, Def. Ex.
D- Elmhurst Med. Record 778).

[17]  At the time of trial, Dr. Rosenberg was the Associate Director of
Surgical Pathology at Massachusetts General Hospital, and had been a staff
pathologist at Massachusetts General Hospital since 1985.

Laboratory of Mid-Louisiana and Elmhurst Hospital, and a timeline of plaintiff's clinical symptoms prepared by plaintiff's counsel. Dr. Rosenberg did not review the actual BOP medical reports underlying the timeline, with the exception of the pathology reports in the medical record. (Tr. 327). Dr. Rosenberg's opined within a reasonable degree of medical certainty that plaintiff's cancer was a slow growing cancer that was likely present 18-19 months prior to April 2002,[18] or in other words, as early as September or October 2000, during Lopez's detention in FCI Loretto, Pennsylvania. (Tr. 308).

Dr. Rosenberg based this conclusion largely on the grade of the cancer, which indicated slow growth, and other available evidence, such as the clinical findings described in the timeline, which indicated when the cancer started producing relevant symptoms such as hoarseness. The "grade" of a cancer refers to how closely a cancer cell mimics a normal cell; this is also known as its "level of differentiation." Dr. Rosenberg testified that when a pathologist examines tissue to determine whether a cancer is present, the pathologist will "grade" the

---

[18] As is later discussed, Lopez underwent a surgical procedure at New York's Elmhurst Hospital in April 2002, which resulted in the removal of half of his larynx. This procedure is called a hemilargyngectomy. Dr. Rosenberg reviewed pathology slides of a "resection specimen," based on tissues removed during this procedure.

cancer. (Tr. 267).[19]   Lopez had a squamous cell carcinoma with a

grade of well-differentiated in some areas and moderately-

differentiated in others. (Tr. 284-85).   Dr. Rosenberg testified

that moderately-to-well differentiated cancer usually has a long

growth period, 1 ½ yrs to 2 years of the cancer being present,

progressively enlarging and producing symptoms. (Tr. 290).

Dr. Rosenberg testified that a pathologist cannot

determine with certainty the life span of a cancer from looking

solely at the pathological slides.   However, he opined that by

looking at pathological information in conjunction with clinical

symptoms described in the medical record, a physician can

determine when the cancer was large enough to produce symptoms.

(Tr. 289).   It is undisputed that hoarseness is the primary

symptom of glottic cancer and is associated with the various

stages of glottic cancer. (Tr. 377-81).   Glottic cancer is unique

in that the recognizable symptom of hoarseness presents itself

early in the course of the disease. (Tr. 377-378).   The cancer

interferes with the reverberation of the vocal cord, causing

---

[19] Pathologists generally use a three-tier grading system.   A well-differentiated cancer is one that contains many of the features of a normal cell, but enough different features that it can be said to be malignant.   Dr. Rosenberg testified that the growth rate of such a cancer is generally slower, and involves a long clinical history. (Tr. 268).   A moderately-differentiated cancer bears less resemblance to the normal cell, and will generally have a more rapid clinical growth rate.   A poorly-differentiated cancer bears little resemblance to the normal cell type, and has the greatest propensity to grow rapidly. (Tr. 268).

voice abnormality and chronic hoarseness.[20] (Tr. 771).

Dr. Gensler, defendant's pathology expert, provided contrary testimony based on her review of the same 40 pathology slides reviewed by Dr. Rosenberg.  While Dr. Gensler did not dispute the finding that Lopez's cancer was well-to-moderately differentiated and agreed that it was not possible to surmise when a cancer began based solely on pathology samples at the time of diagnosis, Dr. Gensler also testified that there was no correlation between the grade of glottic cancer and rate of growth of that cancer. (Tr. 673-75).  Dr. Gensler testified that she did not view grading to be useful in determining the longevity of head and neck cancers.  Instead, she advocated a risk assessment approach based on various factors, such as pattern of invasion, tumor, and host response. (Tr. 720). Although she recently published an article regarding her theory in the February 2005 issue of the American Journal of Surgical Pathology (Tr. 671), she acknowledged that her theory was not yet regularly accepted in the medical community (Tr. 730), nor was it part of any textbook on pathology or a part of any generally accepted curriculum for residents in pathology. (Tr. 720).  Dr. Gensler also testified that she did not review any clinical findings concerning Lopez in order to determine when his cancer

---

[20] There are also various causes of temporary hoarseness, such as laryngitis, overuse of the voice, post nasal drip, sinusitis and allergies. (Tr. 554).

might have been present prior to diagnosis. (Tr. 720-21).

I am persuaded by Dr. Rosenberg's opinion that the cancer cells were present in September or October 2000, when Lopez began complaining of chronic hoarseness to PAs in FCI Loretto, PA.  While pathological slides alone may not provide a basis for a determination within a reasonable degree of certainty of a cancer's presence, I am persuaded by Dr. Rosenberg's testimony that a cancer's grade in conjunction with clinical findings of symptoms such as hoarseness point to the presence of a cancer during Lopez's confinement in Loretto, PA.[21]

### Post-Incarceration Condition and Treatment

After his discharge from prison, Lopez began treatment at Elmhurst Hospital in Queens, New York.  A CT Scan and other diagnostic studies were repeated and the treating physician, Dr. Juan Moscoso, recommended that Lopez undergo a hemilaryngect-omy.[22]  Experts for both parties testified that given Lopez's condition at the time, he had three treatment options: (1) full laryngectomy; (2) partial laryngectomy; or (3) radiation and

---

[21] Although Dr. Kraus opined that the tumor's regrowth during the period of February 2002 to April 2002, after the "debulking" by Dr. Warshaw, suggested a "relatively rapidly growing tumor," (Tr. 843), I find the testimony of Dr. Rosenberg more persuasive given the nature of Lopez's clinical symptoms at the end of 2000 and beginning of 2001.

[22] A "hemilargyngectomy" is a procedure in which the surgeon removes a portion of the voice box, whereas a "full laryngectomy" is a procedure in which the entire voice box is removed, and the cut end of the trachea is brought to the edge of the skin, thereby giving the person a permanent breathing hole in his or her neck in order to separate the air passage system from the swallowing mechanism. (Tr. 462).

chemotherapy. (Tr. 465-66, 819-20). Although Dr. Fabian and Dr. Kraus both testified that they would have opted for the non-surgical option had Lopez been one of their own patients, they stated that the choice is a matter of clinical judgment and the hemilargyngectomy is an accepted practice among ENT physicians. (Tr.464-65, 819-20). On April 12, 2002, at Elmhurst Hospital, Lopez underwent a hemilargyngectomy, which resulted in the removal of a portion of the right side of his voice box. During this procedure, a tracheotomy tube was inserted into the trachea below Lopez's voice box. Lopez currently breathes through this tracheotomy tube. (Pl. Ex. 42 at 22-23).

A subsequent pathology report revealed that the hemilargyngectomy performed on April 12, 2002 was unsuccessful because cancer cells remained at the margins. The presence of cancer cells at the margins implies that the surgeon did not remove all of the cancer and that cancer cells may still be present in the patient. (Tr. 467). The existence of cancer at the margins was not addressed by the treating physicians at Elmhurst Hospital. (Tr. 467).

Beginning in May 2002, Lopez underwent a series of additional procedures to address stenosis, a progressive narrowing of the airway which can be a complication of a hemilargyngectomy. These surgical procedures occurred on May 15, 2002, June 28, 2002 and August 20, 2002. (Tr. 470-472). From

July 2002, Lopez sought additional care at the New York Eye & Ear Infirmary. (Pl. Ex. 55). On September 17, 2002, Lopez had a surgical biopsy, which revealed that the cancer had recurred. He was diagnosed with recurrent laryngeal squamous cell cancer and supraglottic (or above the voice box) stenosis. Dr. Schant, the treating physician, recommended that Lopez undergo a total laryngectomy. Lopez inquired as to potential alternatives. The Tumor Board[23] at NY Eye and Ear opined that similar results could be achieved by treating Lopez with a combination of radiation and chemotherapy. (Tr. 474-476).

The Tumor Board staged Lopez's recurrence as a Stage IVA, T4, N1, MO, recurrent glottic carcinoma. The propriety of this staging was disputed by the defendant. Dr. Kraus, defendant's expert in head and neck oncology, testified that the AJCC cancer staging guidelines are applicable only to initial staging, not to a recurrence, and once a patient has undergone any treatment for the initial diagnosis of cancer, the AJCC staging system is no longer valid. (Tr. 768, 826). Dr. Gensler, defendant's pathology expert, also testified that recurrences are not usually staged. (Tr. 734-735). I am persuaded by the testimony of Dr. Kraus and Dr. Gensler that the Tumor Board's

---

[23] Dr. Fabian testified that a "Tumor Board" is a board at hospitals that brings together physicians from different specialities which treat that particular cancer. In the case of head and neck cancers, a tumor board would involve interaction between the surgeon, medical oncologist, and radiation therapist. (Tr. 475).

staging of Lopez's recurrence was an incorrect use of the staging system.

Lopez began chemotherapy on October 17, 2002, and thereafter, underwent approximately one cycle of chemotherapy a month. Lopez completed his final round of chemotherapy on June 18, 2003. Lopez underwent additional surgical procedures to address the scarring and narrowing of his airway. (Tr. 487-88, 496-97). During one of these procedures, Lopez's epligottis, or the base of the vocal cords, was removed. Since the end of his chemotherapy treatment, Lopez has not had another recurrence of cancer.

At the time of trial, Lopez continued to receive outpatient care at Elmhurst, and was also referred to Mt. Sinai Hospital's Ear Nose and Throat Clinic for further care. Lopez testified that he is required to take various medications as part of his treatment. These medicines include "lidocane viscus," which anesthetizes his throat prior to eating, so he can swallow, pain medications for constant pain around the opening in his neck, and antibiotics for frequent infections. (Pl. Ex. 42 at 67-69). Lopez has difficulty speaking, and can speak only by placing a finger over his throat. Lopez's tracheotomy tube requires frequent cleaning and maintenance, and the tube often causes him to cough. (Pl. Ex. 42 at 69). Lopez testified that his illness causes him stress, embarrassment, and makes him feel

ostracized by others who react to the tracheotomy tube and opening in his throat. (Pl. Ex. 42 at 76-77).

Lopez will continue to need monitoring and treatment for the remainder of his life. Experts for both parties testified that Lopez's tracheotomy tube will likely never be removed. In the future, Lopez will require routine oncological care and procedures to evaluate possible recurrence, such as x-rays, head and neck examinations, laryngoscopies and biopsies if there is an indication of recurrence. (Tr. 828-29, 488, 490, 843-44). Dr. Fabian testified that Lopez is likely to face bouts of dermatitis or inflammation of the neck, swelling, and a breakdown of the skin and neck around the opening where the tube is inserted. (Tr. 490). Lopez will face increased risk of bronchitis and pneumonia in the winter and localized infection called tracheitis. (Tr. 490). Lopez will continue to have pain related to scarring, coughing, inflammation of the skin and neck. (Tr. 491).

The experts disagreed on whether Lopez was likely to require additional procedures to improve the narrowing of his airway. Dr. Fabian testified that Lopez was likely to require such procedures, while Dr. Kraus opined that future surgeries to remove scarring would not be likely. (Tr. 488, 843-44). I find the evidence on this issue to be inconclusive. The experts also disagreed as to whether Lopez was likely to face expiration

ammonia, whereby food or drink goes down the wrong way and ends up in his lungs, necessitating a feeding tube. Dr. Fabian testified that such a scenario was likely (Tr. 490, 499), whereas Dr. Kraus testified that this was not likely because Lopez's narrowed laryngeal opening would make it difficult for food to penetrate into his trachea. (Tr. 830). I am persuaded by Dr. Kraus's testimony that Lopez's narrowed laryngeal opening would make a feeding tube unlikely.

### Applicable Legal Standard–FTCA

The Federal Tort Claims Act permits plaintiffs to pursue claims against the United States to recover money damages for "injury or loss of property...caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b); *United States v. Muniz,* 374 U.S. 150 (1963). The primary purpose of the FTCA is to "remove the sovereign immunity of the United States from suits in tort, and with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States,* 369 U.S. 1, 6 (1962); 28 U.S.C. § 1346(b). The FTCA authorizes suit in the judicial district where the plaintiff lives or the alleged tort occurred. 28 U.S.C. § 1402(b).

As a prerequisite to an action under the FTCA, a claimant must file a written claim with the appropriate Federal

agency within two years after the claim accrues.  28 U.S.C. §
2401(b).  Plaintiff Lopez timely filed an administrative tort
claim with the Federal Bureau of Prisons ("BOP") seeking $6
million for personal injury due to medical negligence on April
18, 2002, which was denied by the BOP on October 10, 2002.  (*See*
Pl. Ex. 29-31).  Any recovery of damages in this case cannot
exceed the $6 million amount sought in the administrative claim.
*See* 28 U.S.C. § 2675(b).

Choice of Law

    The FTCA specifies that claims against the United
States be determined "in accordance with the law of the place
where the act or omission occurred."  28 U.S.C. § 1346(b).  In
this case, relevant acts and omissions occurred in Pennsylvania,
Oklahoma and Louisiana.  In a multi-state tort action, courts
must apply "the whole law, including the choice of law rules, of
the state where the alleged act or omission occurred." *Richards
v. United States*, 369 U.S. 1 (1962).  However, *Richards* sheds no
light on the question of which state's "whole law, including
choice of law rules" should be applied where multiple acts or
omissions have occurred in more than one state.

    Courts presented with this issue have employed a two-
step choice of law analysis: (1) first, the court selects between
the states' respective choice of law rules; (2) second, the court
applies that state's choice of law rules to determine which

state's substantive law applies.  *See Gould Electronics v. United States,* 220 F.3d 169, 180 (3d Cir. 2000).  Before proceeding to this conflict of laws analysis, it is first appropriate to determine whether there is an actual conflict between the states' underlying choice of law rules or the states' underlying substantive law. *See id.*  In this case, there is a conflict in the underlying substantive law relating to damages.  Louisiana law imposes a $500,000 damages cap on medical malpractice awards (excluding the costs of future medical care), while Pennsylvania and Oklahoma do not. *See e.g. Blakely v. Wolford,* 789 F.2d 236, 230 (3d Cir.1986)(Pennsylvania medical malpractice law has "no statutorily imposed cap on damage awards."); La. Rev. Stat. § 40:1299.42 (B)(1) ("[T]he total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits...,shall not exceed five hundred thousand dollars plus interest and costs."); *Owens v. U.S.,* 935 F.2d 734, 735 (5th Cir.1991)(holding that the U.S. is entitled to the protection of Louisiana's liability cap in an FTCA claim); *Middlebrook v. Immler,* 713 P.2d 572 (Okl. 1985)(no statutory cap applied to damages in Oklahoma medical malpractice action).

Moreover, Pennsylvania, Louisiana and Oklahoma employ different choice of law rules.  The choice of law rules under Pennsylvania and Louisiana law are somewhat similar in that they

focus on the issue of impairment of governmental interests.[24]
However, Oklahoma law requires courts to apply the substantive
law of the state with the most significant relationship to the
occurrence and the parties, using the following factors as a
guide: place of injury and injurious conduct, domicile and
residence of the parties, place where the relationship between
the parties occurred. *See BancOklahoma Mortgage Corp. v. Capital
Title Co.,* 194 F.3d 1089, 1103 (10th Cir. 1999).

Where, as here, there is a conflict between the states'
substantive and choice of law rules, courts have adopted five
different approaches. *See Gould Electronics v. United States,* 220
F.3d 169, 181-83 (3d Cir. 2000). In the "first approach, when
the injury can be parsed by the acts or omissions in different
states," at least one court has "applied choice of law rules on
an act-by-act basis, applying the relevant state's choice of law
rules for each act or omission." *Kohn v. United States,* 591

---

[24] Pennsylvania employs "a combination of the 'government interest'
analysis and the 'significant relationship' approach of the Restatement
(Second) of Conflicts." *Troxel v. A.I. duPont Institute,* 431 Pa. Super. 464,
467-68 (Pa. Super. 1994). It takes into account both the grouping of contacts
with the various concerned jurisdictions and the interests and policies that
may be validly asserted by each jurisdiction. Under Louisiana's choice of law
rules, courts apply a "comparative impairment test," in which courts apply the
"law of the state whose policies would be most seriously impaired if its law
were not applied to that issue." *Skansi Marine, LLC v. Ameron International
Corporation,* 2003 WL 22852221 (E.D.La.); La. Civ. Code Ann. art. 3515 (West
1994). That state is determined by evaluating the strength and pertinence of
relevant policies of all involved states and in light of: "(1) the
relationship of each state to the parties and the dispute; and (2) the
policies and needs of the interstate and international systems, including the
policies of upholding the justified expectations of the parties and of
minimizing the adverse consequences that might following from subjecting a
party to the law of more than one state." *Id.*

F.Supp. 658, 572 (E.D.N.Y 1984), *aff'd* 760 F.2d 253 (2d
Cir.1985).[25] The defendant argues in its post-trial submissions
that this Court should adopt the *Kohn* approach. (*See* Def. Post-
Trial Brief at 23). In *Kohn,* "[b]ecause each act by the Army was
a distinct tort that, absent the others, could have caused an
emotional distress injury, the court applied Kentucky choice of
law to the acts in Kentucky and New York choice of law to the
acts in New York." *Gould,* 220 F.3d at 183, *citing Kohn,* 591
F.Supp. at 572. Here, however, as in *Gould*, the *Kohn* approach is
"unworkable" because the plaintiff's injuries are "indivisible
and cannot be parsed based on the alleged acts by the United
States." *Gould*, 220 F.3d at 182.

A second and third approach were outlined in *Bowen v.
United States,* 570 F.2d 1311, 1318 (7th Cir.1978). In *Bowen,* an
airplane en route from Arkansas to Indiana crashed in Indiana due
to ice on the wings. The *Bowen* court determined that it should
elect the choice of law rules of "the place of the last act or
omission having causal effect" or "the place of the act or
omission having the most significant effect." *Id.* at 1318. The
*Bowen* court did not have to choose between the approaches because

---

[25] In *Kohn,* the plaintiffs sued the United States Army for emotional
distress caused by acts or omissions occurring in Kentucky and New York,
relating to the treatment of a family member's corpse. *See id.* at 571. In
Kentucky, plaintiffs alleged the Army performed an unauthorized autopsy,
cremation of organs, embalming, and failed to return organs to the body for
burial. In New York, plaintiffs alleged that the Army gave misleading
information about the circumstances of the death, failed to provide an honor
guard at the burial, and other acts. *See id.*

both pointed to Indiana; however, the *Bowen* court expressed a

preference for the latter "most significant causal effect"

approach, finding it to be the approach most consistent with the

FTCA's focus on the "acts and omissions themselves." *Id.* at

1318; *see also Spring v. United States,* 833 F.Supp. 575, 576

(E.D.Va. 1993), n.7 (expressing a preference for the "most

significant causal effect" approach, because it "prudently

recognize[s] the potential for conflict when more than one

state's law is applied and sensibly opts for the whole law of the

state most closely tied or related to the wrong.").[26]

    I conclude that the "most significant causal effect"

approach articulated in *Bowen* and *Spring* is the best approach in

the circumstances here presented.[27]  I also conclude that the

---

[26] The fourth and fifth approaches outlined in *Gould* are of limited use
in this case.  Under the fourth approach, the court selects the choice of law
rules of the state in which "physical acts" could have prevented the injury.
*See Ducey v. United States,* 713 F.2d 504, 509, n.2 (9th Cir.1983).  In *Ducey,*
plaintiffs brought an FTCA claim alleging injuries arising from the
government's failure to place warning signs and erect fences at a Nevada park.
Although a California government office issued decisions partly responsible
for this failure, the *Ducey* court elected Nevada choice of rules because the
injury could have been prevented only by physical acts in Nevada.  *Id.*  This
approach is unworkable here, because plaintiff's injury could have been
prevented by physical acts in all three states.  Under the fifth approach, the
court applied the choice of law rules of the state where the relevant
negligent acts occurred. *See Hitchcock v. United States,* 665 F.2d 354, 359
(D.C.Cir.1981)(although plaintiff was injured by vaccine administered in
Virginia, the only relevant negligent act was the development of the protocol
for administering the vaccine, which occurred in D.C.).  Again, the fifth
approach is unworkable here because relevant negligent acts occurred in more
than one state.

[27] Defendant argues that because it cannot be determined when
plaintiff's cancer first developed, any attempt to identify a "last
significant act" is futile. (*See* Def. Post-Trial Brief at 24).  However, as
previously discussed, I am persuaded by Dr. Rosenberg's testimony that within
a reasonable degree of medical certainty, based on the cancer's grade and
Lopez's clinical symptoms, Lopez's cancer was present as of the final months

acts or omissions having the most significant causal effect on the plaintiff's injuries occurred in Pennsylvania, where plaintiff's cancer should have been diagnosed and, if diagnosed, prevented, Lopez's numerous and well-justified attempts to obtain an ENT referral were rejected by BOP medical personnel in violation of the applicable standard of care as discussed below, and intervention could have led to prompt diagnosis and the least invasive treatment. Accordingly, I apply Pennsylvania's choice of law rules to determine which state's substantive law should be applied.

Pennsylvania's choice of law rules follow a two-part inquiry to determine which state's substantive law should apply. *See McCrossan v. Wiles,* 2004 WL 1925057, st *3 (E.D.Pa. 2004).[28] First, a court should determine whether one or both jurisdiction's governmental interests would be impaired by application of the other jurisdiction's law. *Id. (quoting Lacey v. Cessna Aircraft Co.,* 932 F.2d 170, 187 (3d Cir. 1991)). If only one state's interest would be impaired, Pennsylvania courts apply the law of that state; if both states' interests would be

_____

of 2000 and early 2001, and should have been diagnosed when Lopez was incarcerated in Loretto, Pennsylvania.

[28] In *Griffith v. United Airlines,* 203 A.2d 796 (1964), the Pennsylvania Supreme Court abandoned the strict lex loci delicti choice of law rules. That rule had provided that the law of the place of injury would govern in all tort actions brought in Pennsylvania courts for injuries sustained in other states. In its place, Pennsylvania's highest court adopted "a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court." *Id.* at 805.

impaired, courts make a flexible, "qualitative analysis of the contacts between the parties..." *Id.*

In this case, the damage policies of the three states promote different policies and interests. The liberal compensation policies of Pennsylvania and Oklahoma reflect those states' interest in ensuring that victims of medical malpractice are fully compensated for their injuries. Louisiana's limitation on malpractice damages reflects that state's policy to limit malpractice claims and control health care costs within that state. *See Blakely v. Wolford,* 789 F.2d at 241 (comparing interests promoted by differing damage policies). As the interests of Oklahoma and Pennsylvania would be impaired if Louisiana's substantive law was applied, and the interest of Louisiana would be impaired if the other jurisdictions' damages law was applied, I consider the parties' contacts with the jurisdictions involved on a qualitative scale. *See Beardsley v. Vac-Con Co., Inc.,* 2001 WL 34368918 (E.D.Pa. 2001). Here, for reasons discussed above, the parties' most qualitative contacts occurred in Pennsylvania, where the most significant conduct giving rise to the injury took place. Accordingly, I apply Pennsylvania substantive law.

<u>Pennsylvania Medical Malpractice Liability</u>

The United States Bureau of Prisons has a duty to provide adequate medical care to a prisoner. *See Yosuf v. United*

*States,* 642 F.Supp. 415, 427 (M.D.Pa. 1986); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Under Pennsylvania law, "physicians and medical staff are liable for failure to exercise ordinary skill, care and diligence which results in injury to the patient." *Podlog v. United States,* 205 F.Supp.2d 346, 357 (M.D.Pa. 2002); *Berman v. United States,* 205 F.Supp.2d 362, 364 (M.D.Pa. 2002); *Incollingo v. Ewing,* 444 Pa. 263, 299 (1971).  The plaintiff must show by competent medical evidence that the conduct of medical personnel fell below the standards of reasonable medical practice under the circumstances and proximately caused his injuries. *Berman,* 205 F.Supp.2d at 364.

To establish a *prima facie* case of medical malpractice in Pennsylvania, a plaintiff must show four elements: "(1) that the medical practitioner owed a duty to the patient; (2) that the practitioner breached that duty; (3) that the breach of duty was the proximate cause of, or a substantial factor in bringing about the harm suffered by the patient, and (4) the damages suffered by the patient were the direct result of the harm."  *Cruz v. Northeastern Hosp.,* 801 A.2d 602, 607 (2002), citing *Mitzelfelt v. Kamrin,* 584 A.D. 888, 891 (1990); *see also Mellon Bank v. United States,* 2003 U.S. Dist. LEXIS 12779 at *15 (M.D. Pa. 2003).  In this case, the plaintiff must show by a preponderance of the evidence that the "failure to diagnose and treat was a deviation from good and acceptable standards, and that such

deviation was the proximate cause of the harm suffered."[29]
*Kurian ex Re. Kurian v. Anisman,* 851 A.2d 152, 155 (Pa. 2004).
Furthermore, a plaintiff must present "an expert who will testify
to a reasonable degree of medical certainly, that the acts of the
defendants deviated from the acceptable medical standards, and
that the deviation constituted a substantial factor in causing
the plaintiff's injury." *Berman,* 205 F.Supp.2d at 364, (*citing
Mitzelfelt,* 584 A.2d at 892 (Pa. 1990)).

<u>Breach of Duty</u>

The central issue is whether BOP physicians and
physicians assistants who examined Lopez breached their duty of
care by failing to diagnose and treat Lopez's glottic cancer.
More specifically, the question is whether BOP medical staff
breached the duty of care by failing to refer Lopez to an ENT
specialist at an earlier date. There is nothing in the record to
suggest that Lopez deliberately or carelessly avoided the
opportunity for treatment. Both the BOP medical record and the
trial testimony make clear that during the period from September
2000 to February 2002, when Dr. Warshaw diagnosed Lopez with
glottic cancer, Lopez repeatedly complained of a constellation of
throat related symptoms, including sore throat, difficulty

_____

[29] Pennsylvania also recognizes that a physician has a duty to perform
adequate and complete tests in order to secure a sufficient factual basis upon
which to support a diagnosis or judgment, and to provide adequate care based
upon the results of testing. *See Yosuf,* 642 F.Supp at 428 (recognizing that
the "Bureau of Prisons ha[s] the duty to give adequate tests and the care
those tests indicated"); *Smith v. Yohe,* 412 Pa. 94, 100 (1963).

swallowing, and most important, hoarseness.  In this case, I find
that BOP physicians and physicians assistants deviated from the
medically accepted standard of care in failing to refer Lopez to
an ENT, at the latest, by November or December of 2000.

Dr. Talavera,[30] plaintiff's internal medicine and
primary care expert, explained that the term "primary care
provider" includes physicians, physicians assistants and nurse
practitioners, and that all primary care providers are obligated
to adhere to the same standard of care. (Tr. 63).  Based upon his
review of the BOP medical records, Dr. Talavera opined within a
reasonable degree of medical certainty that there were several
instances beginning in June 2000 when BOP physicians and
physicians assistants in Pennsylvania, Oklahoma and Louisiana
departed from the standard of care by failing to refer Lopez to
an ENT. (Tr. 98-99, 102-103, 115-16, 122-27, 136, 140).  Dr.
Talavera testified that when a patient has symptoms of continued
sore throat and hoarseness, as Lopez did, the standard of care
requires an ENT evaluation, because a proper evaluation cannot be
made with the naked eye. (Tr. 104-09).

Dr. Fabian, plaintiff's expert in head and neck cancer,
also testified that based upon his review of all the BOP medical

---

[30] Dr. Talavera was, at the time of trial, Director of the Department of
Internal Medicine at Cabrini Medical Center in New York, a position which held
for more than ten years.  He also served as am Assistant Professor of Internal
Medicine at Mount Sinai Hospital, and was Board Certified in Internal Medicine
with a sub-specialty in pulmonology. (Tr 50-59).

records, Lopez should have seen an ENT for an evaluation of the larynx, at the latest, between November and December 2000. (Tr. 393-94). Dr. Fabian opined within a reasonable degree of medical certainty that the BOP's failure to refer Lopez in November or December 2000, after he had complained for 3-4 consecutive months of a constellation of throat-related problems, particularly hoarseness, was a deviation from the standard of care. (Tr. 400).[31]

While defendant did not offer the testimony of a primary care expert, defendant's expert in head and neck cancer, Dr. Kraus, opined that there was no deviation from the standard of care in the treatment received by Lopez. (Tr. 795). Dr. Kraus testified that Lopez's early throat complaints were likely due to chronic posterior nasal drainage irritating his throat rather than laryngeal cancer, and that Lopez did not manifest symptoms of glottic cancer until November or early December 2001 (Tr. 795-96). However, I find Dr. Kraus's testimony on this issue unpersuasive for several reasons.

First, although Dr. Kraus testified that his opinion was based on a thorough review of the BOP medical record, it

---

[31] Dr. Fabian also testified that even when Lopez was finally referred to Dr. Warshaw in Louisiana, the consult request prepared by Dr. Blocker at Oakdale, Louisiana on September 18, 2001 was insufficient because it referred only to Lopez's breathing problems due to the septoplasty, and not Lopez's voice problems. (Tr. 444, BOP 16, BOP 576). Dr. Fabian opined that Dr. Blocker deviated from the standard of care both by not stating "voice change" in the ENT consult request, and by failing to notice that the ENT had failed to do an evaluation of the vocal cords. (Tr. 443-44).

became apparent on cross-examination that Dr. Kraus's review of

the BOP record was cursory, causing him to overlook several of

Lopez's throat complaints in the months preceding November 2001.

(Tr. 869-886).[32]  In addition, Dr. Kraus based his opinion

largely on the observation plaintiff's hoarseness was

"intermittent" (i.e. it "gets better" and then comes back) rather

than "continuous." (Tr. 865).  However, Dr. Kraus could not

identify any part of the BOP record where Lopez's hoarseness was

described as having resolved itself prior to recurring. (Tr.

868).  Instead, Dr. Kraus based his conclusion of "intermittent"

hoarseness on the concept of the "pertinent negative," i.e. that

during certain visits to the prison medical staff, Lopez

complained of other ailments aside from hoarseness or throat

pain. (Tr. 866).  I find this argument to be unpersuasive.  The

fact that Lopez did not mention hoarseness during each medical

---

[32] Dr. Kraus did not recall the amount of time he spent reviewing the approximately 3000 page BOP medical record.  (Tr. 848).  In preparation for trial, Dr. Kraus prepared an expert report dated June 13, 2004; in the first part of the report, he described Lopez's BOP medical treatment, which led him to the conclusion offered in the second part of the report that "it only becomes evident in 11/01 that the patient has symptoms consistent with possible laryngeal carcinoma." (Pl. Ex. 81). However on cross examination, Dr. Kraus admitted that in his report, he failed to consider Lopez's complaints of hoarseness made to BOP medical staff on November 17, 2000, January 23, 2001, March 7, 2001, April 21, 2001, July 18, 2001, August 21, 2001, September 18, 2001, and September 28, 2001  (Tr. 864, 865, 874, 876, 877, 878, 880). Moreover, when questioned on cross-examination, Dr. Kraus was unable to point to any specific part of the BOP record which led him to conclude that Lopez's cancer symptoms only became evident in "November of 2001."  Dr. Kraus responded that his opinion was not based on specific aspects of the record but rather his "Gestalt impression." (Tr. 886).  Dr. Kraus's reliance on a vague "impression" from the record stands in stark contrast to the testimony offered by Dr. Fabian, who displayed a thorough familiarity with plaintiff's BOP medical record, and whose opinion was based on a detailed and comprehensive review of the medical record.

examination in this time period does not justify an inference that his throat-related problems resolved themselves. On the contrary, numerous notations in the BOP record refer to the "continued" or "ongoing" nature of Lopez's throat and voice complaints. *See e.g.* BOP 41, dated January 23, 2001 (noting that Lopez's complaints of "hoarseness for 3 months" and "still sore throat"); BOP 50, dated December 11, 2000 (noting that Lopez "continues to have harsh voice, sore throat").

In any case, quite apart from the question of whether the hoarseness was "intermittent" or continuous, there is ample evidence in the BOP medical record that the BOP medical staff breached its duty of care. Dr. Kraus testified that his patients are generally referred from ENT specialists after they have been diagnosed, and that he is not familiar with the standard of care of a primary care provider. (Tr. 846). Dr. Talavera was the only expert witness who testified as to the standard of care for primary care providers. Dr. Talavera's testimony makes clear that even if the intensity of Lopez's hoarseness varied over a period of time, the fact that his hoarseness continued to recur for months, along with other throat-related problems, despite repeated treatments with antibiotics, should have signaled to the BOP primary care providers at FCI Loretto and after that a more significant disease process was responsible requiring consultation with an ENT specialist. In the period of September

to December 2000 alone, there are at least twelve discrete references in the BOP medical record to Lopez's throat-related symptoms. (BOP 306, 44, 320, 46, 319, 26, 25, 317, 53, 51, 52, 50).

It appears from the BOP records that the medical staff, particularly at FCI Loretto, might have regarded Lopez as a chronic complainer, malingerer or a hypochondriac. Lopez had requested numerous medical examinations for a variety of ailments, such as abdominal and back pain, during the course of his incarceration. (Tr. 866). However, Dr. Talavera testified that even in situations where a patient is believed to be a malingerer or hypochondriac, a primary care provider's duty of care is to pursue significant symptoms as if they were real, particularly if they are recurring or persistent symptoms, until the more serious causes of those symptoms can be eliminated. (Tr. 159). Even if Lopez was regarded to be a malingerer, BOP medical providers had a duty to consider the existence of more serious causes of his recurrent throat-related symptoms by referring him to an ENT. Based on the evidence at trial, I find that BOP providers breached the medically accepted standard of care in failing to refer Lopez to an ENT while he was still in Pennsylvania.

## Proximate Cause

"Proximate cause is a term of art, and may be

established by evidence that a defendant's negligent act or
failure to act was a substantial factor in bringing about the
harm inflicted upon a plaintiff." *Jones v. Montfiore Hospital,*
431 A.2d 920, 923-24 (1981)(citing *Gradel v. Inouye,* 491 Pa. 534,
542 (1980).   In cases such this one, where the issue is a failure
to timely diagnose cancer, Pennsylvania courts have held that:

> [O]nce there is testimony that there was a failure to detect
> the cancer in a timely fashion, and such failure increased
> the risk that the [patient] would have either a shortened
> life expectancy or suffered harm, then it is a question for
> the jury whether they believe by a preponderance of the
> evidence, that the acts or omissions of the physician were a
> substantial factor in bringing about the harm.

*Mitzelfelt,* 584 A.2d at 892.

        "This substantial factor need not be...the only factor"
which produces the result.   *Jones v. Montfiore Hospital,* 431 A.2d
at 923.   Under Pennsylvania law, a "defendant cannot escape
liability because there was a statistical probability that the
harm could have resulted without negligence."   *Mitzelfelt,* 584
A.2d at 894.   A plaintiff "need not exclude every possible
explanation and the fact that some other cause concurs with the
negligence of the defendant in producing an injury does not
relieve defendant from liability unless he can show that such
other cause would have produced the injury independently of his
negligence." *Jones v. Montfiore Hospital,* 431 A.2d at 923.

        In this case, Lopez has established by a
preponderance of the evidence that the BOP's failure to refer him

to an ENT prior to June 2001 delayed his diagnosis and was a substantial factor in causing him harm.  Specifically, the acts and omissions of BOP medical providers were a substantial factor in causing Lopez to undergo a more invasive course of treatment than otherwise would have been necessary.  I find credible and persuasive the testimony of Dr. Fabian, who opined within a reasonable degree of medical certainty that had the BOP referred Lopez to an ENT specialist for an evaluation of the larynx prior to June 2001, the cancer would have been a Stage I or *in situ* (or pre-invasive) cancer, which would not have required a more invasive treatment such as a hemilargyngectomy.  (Tr. 484, 393-94).  A Stage I cancer is generally treated only by radiation therapy, as opposed to surgery, and the potential complications associated with Stage I treatment are rare. (Tr. 486).

While a treating physician can opt for a combination of chemotherapy and radiation, a non-surgical option, to treat Stage II cancer, experts for both parties testified that a hemilargyngectomy is an accepted treatment option among ENT physicians for Stage II glottic cancer and not unusual as a matter of practice.  (Tr. 631, 633, 819-20).  The decision to opt for one treatment choice over the other is a matter of clinical judgment, and there are advocates for both procedures in the medical community (Tr.464-65, 819-20).

Defendant raises the affirmative defense of

contributory negligence, and argues that Lopez proximately caused

his present condition because he: (1) chose to undergo a

hemilaryngectomy; (2) concealed a history of smoking from the BOP

medical staff; and (3) delayed his treatment after diagnosis.

Under Pennsylvania law:

> [C]ontributory negligence is conduct on the part of the
> plaintiff which falls below the standard [of care] to which
> he should conform for his own protection and which is a
> legally contributing cause, cooperating with the negligence
> of the defendant, in bringing about the plaintiff's harm.
> Contributory fault may stem either from a plaintiff's
> careless exposure of himself to danger or from his failure
> to exercise reasonable diligence for his own protection.

*Angelo v. Diamontoni,* 871 A.2d 1276, 1281 (Pa. Super.2005)

(quoting *Columbia Med. Group, Inc. v. Herring & Roll, P.C.,* 829

A.2d 1184, 1192 (Pa. Super.2003).  "The burden to establish the

plaintiff's conduct as a contributory factor in his injury rests

with the defendant, who must show both the negligence of the

conduct alleged and the causal relationship of that conduct to

the injuries for which damages are sought."  *Angelo,* 871 A.2d at

1281 (citing *Pascal v. Carter,* 436 Pa. Super 40. 64 (1994)).

Here, defendant has failed to satisfy the requisite burden.

First, defendant argues that Lopez, rather than BOP

medical personnel, proximately caused his present condition by

choosing to undergo a hemilargyngectomy rather than the non-

surgical treatment choice of chemotherapy and radiation.

However, Lopez followed the advice of Dr. Moscoso, his treating

physician at Elmhurst Hospital, who recommended that he undergo a

hemilargyngectomy, which both parties' experts acknowledged to be

an appropriate treatment option.[33]   In *Zacchi v. The State of New*

*York,* Claim No. 102853 (N.Y.Ct.Cl.) (unpublished opinion), a New

York court in a factually similar case[34] rejected a similar

argument:

> With delayed discovery, [the treating] oncologist,
> recommended the laryngectomy with radiation although it was
> technically feasible...for claimant to choose a more
> conservative treatment.  There is no doubt that claimant
> made the only rational choice available to him at that time,
> but he should not have been faced with a situation that
> virtually required him to elect this radical, life-altering
> form of treatment.

*Id.* at *3.  By following his physician's advice, Lopez made the

only rational choice available to him at the time.  As a result,

it cannot be said that his conduct was negligent, i.e. fell below

the standard of care to which he should conform for his own

protection.

Defendant also argues that Lopez caused his present

condition by concealing a history of smoking from BOP staff.

Such a conclusion is improbable.  The only document in the BOP

medical record on the subject dated May 14, 1999 refers to Lopez

---

[33] Defendant does not assert a defense of "superceding or intervening
cause" in regards to plaintiff's post-incarceration medical treatment at
Elmhurst Hospital. (Def. Post-trial Reply Brief at 17).

[34] The facts in *Zacchi* are close to those of the present case.  The
plaintiff, who was incarcerated in Gouverneur Correctional Facility, made
numerous complaints to medical staff of throat related symptoms before he was
referred to a ear, nose and throat specialist.  The ENT discovered mass lesion
and diagnosed him with T3 laryngeal cancer. Zacchi subsequently underwent
surgery resulting in the removal of his entire larynx.

as a "nonsmoker." (BOP 83).  Subsequent documents contain no

reference to Lopez's status as a smoker or non-smoker, suggesting

that he was never asked the question by BOP medical staff or that

his answers were unrecorded.  Defendant suggests no reason,

rational or otherwise, why plaintiff would lie about his status

as a smoker as early as May 1999.  Accordingly, I am not

persuaded that Lopez concealed a history of smoking from the BOP

medical staff.  Of course, even if Lopez had failed to disclose

his history as a smoker, this would not relieve the defendant of

liability.  Dr. Fabian testified that while smokers are in a

higher risk group for developing laryngeal cancer, such cancer is

not exclusive to smokers.  (Tr. 376-77).  Even if Lopez was

assumed to be a non-smoker by BOP staff, the failure to refer him

to an ENT by November or December of 2000, after three months of

ongoing hoarseness and other throat-related pain, was a gross

deviation from the standard of care which proximately caused

Lopez's injuries.  (Tr. 393-94, 400).

Defendant's argument that Lopez caused his present

condition by delaying his treatment after diagnosis is also

without merit.  Lopez testified that upon his diagnosis in

Oakdale, Louisiana, Dr. Alexander presented him with two options:

(1) to remain at Oakdale prison until his treatment was complete,

or (2) to complete the remaining one week of his sentence, and

seek treatment at home.  Dr. Alexander encouraged him to take the

second option. (Pl. 42 at 50-52). Lopez's testimony on this
issue was not rebutted by the defendant.[35] Lopez was released on
March 1, 2002, and sought treatment one week later at Elmhurst
Hospital in New York. (*Id.* at 54). Having recommended that Lopez
delay his own treatment, the defendant is in no position to argue
that Lopez is responsible for the delay or that this delay was a
proximate cause of injury.[36]

Accordingly, I find that the BOP's failure to refer
Lopez to an ENT specialist by the end of 2000 was a substantial
factor in the delayed diagnosis of glottic cancer, resulting in a
more invasive course of treatment than would otherwise have been
required. Defendant has failed to show that "any other cause
would have produced the injury independently of his negligence."
*Jones v. Montfiore Hospital,* 431 A.2d at 923. Nor were the
injuries caused or contributed to by negligence on the part of
plaintiff.

Damages

There remains the question of the amount of damages to
which Lopez is entitled. As previously discussed, Pennsylvania

---

[35] Interestingly, although the defendant originally intended to call Dr.
Alexander as a fact witness, the defendant ultimately decided not to call him
as a witness at trial, nor did the defendant seek to introduce his testimony
on this issue by means of deposition testimony.

[36] Having raised these arguments in the context of causation, defendant
also raises the same three arguments to suggest that any damages awarded to
plaintiff should be reduced. For reasons previously discussed, I find
defendant's arguments to be equally unpersuasive in the context of damages.

law is the applicable substantive law, and will be applied in determining plaintiff's damage award.  *See e.g. Barnes v. U.S.,* 685 F.2d 66, 69 (3d Cir. 1982); *McDonald v. U.S.,* 555 F.Supp. 935, 962 (D.C.Pa.1983).  Under Pennsylvania law, "damages are to be compensatory to the full extent of the injury sustained." *Id.* (citing *Kaczkowski v. Bolubasz,* 491 Pa. 561, 566 (1980)).  A prevailing plaintiff is entitled to compensation for "all past medical expenses reasonably and necessarily incurred, all future medical expenses reasonably and necessarily incurred for the treatment and care of his injuries; past lost earnings and lost future earning capacity; and past, present and future pain and suffering." *Id.*  A tort plaintiff must only prove damages with "reasonable certainty." *Kaczkowski,* 491 Pa. at 567.  While such proof does not have to conform to "the standard of mathematical exactness," a claim for damages must "be supported by a reasonable basis for calculation; mere guess or speculation is not enough." *McDonald,* 555 F.Supp. at 962 (*quoting Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 453-54 (1964)).  "If the facts afford a reasonably fair basis for calculating how much plaintiff is entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation." *Kaczkowski*, 491 Pa. at 567.

Moreover, personal injury awards are "lump-sum payments," so "all damages for personal injuries, including

damages expected to accrue in the future, must be proved and calculated at trial." *Kaczkowski,* 491. Pa at 567.  In *Yost v. West Penn Rys. Co.,* 336 Pa. 407 (1939), the Supreme Court of Pennsylvania has held that while damages for loss of future earnings must be reduced to present worth, "present worth does not apply to damages awarded for future pain [and] suffering...nor did it apply to future medical attention."  *Id.* at 410; *see also O'Hara v. City of Scranton,* 342 Pa. 137, 139 (1941).[37]  Moreover, the Supreme Court of Pennsylvania has held in *Kaczkowski v. Bolubasz* that "as a matter of law, future inflation shall be presumed to equal future interest rates with these factors offsetting," thereby negating the need to discount lost future earnings to present value.  *Id.* at 583; *Barnes v. United States,* 685 F.2d 66, 70 (3d Cir.1982)(finding that the theory underlying the "total offset rule" in *Kaczkowski* includes

---

[37] Most federal circuit courts and state courts considering the issue have held that awards for future non-pecuniary losses, such as pain and suffering, should not be discounted to present value. *See e.g. Taylor v. Denver & Rio Grande Western R.R.,* 438 F.2d 351, 352 (10th Cir. 1971); *United States v. Hayashi,* 282 F.2d 599, 606 (9th Cir. 1960); *Texas and Pacific Ry. v. Buckles,* 232 F.2d 257, 264 (5th Cir.), *cert. denied,* 351 U.S. 984 (1956); *Braddock v. Seabord Air Line R.R.,* 80 So.2d 662, 668 (Fla. 1955); *O'Hara,* 342 Pa. at 139; *O'Brien v. Loeb,* 229 Mich. 405, 408-409 (1924); *but see Oliveri v. Delta Steamship Lines, Inc.,* 849 F.2d 742 (2d Cir. 1988)(holding that while the time value of money "be taken into account" for awards of non-pecuniary losses, a fact-finder may "forgo the precision appropriate for discounting future earnings."  The reason behind this general antipathy is that, while it makes sense to discount lost future earnings to present value "since those dollars will be received now, rather than in the years they would have been done absent the injury," discounting does not make sense with pain and suffering, where the fact-finder "is invited to select some general sum that the plaintiff should receive now as compensation for pain and suffering he will endure in future years...It is rather artificial to take such a number...and then refine it with precision to present value by an inflation-adjusted discount rate."  *Id.* at 749.

a reduction to present worth); *see also Sonlin v. Abington Memorial Hosp.,* 748 A.2d 213 (Pa. Super. 2000)(noting that the theory underlying the *Kaczkowski* holding was particularly apt "in the field of medical services, where inflation is running at a rate greater than average for all goods and services."). Thus, under Pennsylvania law, future damages whether economic or not are not discounted to present value because the "total offset rule" presumes that future inflation and future interest are equal. Given the FTCA's clear deference to state law on the substantive issue of liability as well as on the computation of damages, *see* 28 U.S.C. §§ 2674 at 1346(b), I will not discount an award for future damages to present value. *See MacDonald v. United States,* 781 F.Supp. 320, 325 (M.D.Pa. 1991)(holding that in an FTCA case, Pennsylvania's "total offset method of calculating damages" was the applicable law).

### Life Expectancy

In this case, a calculation of future damages requires a determination as to Lopez's life expectancy. "It is well settled that mortality tables are admissible in Pennsylvania for the purpose of determining a plaintiff's future damages." *Helm v. Eagle Downs-Keystone Racetrack,* 385 Pa. Super. 550, 552 (1989). However, the "mortality tables are not be applied rigidly," and a fact-finder must also take into account "such matters as sex, prior state of health...and other facts concerning the injured

party which may affect the duration of his or her life." *Id.*
(citing *Rosche v. McCoy,* 397 Pa. 615, 627 (1959)).

Lopez is presently 48 years old.  According to the most
recent statistics issued by the Centers for Disease Control
(CDC), the estimated life expectancy for a male in the United
States is 74.5 years.[38]  At trial, both parties' experts
disagreed on the impact of Lopez's condition on his life
expectancy.  Both parties' experts did agree, however, that the
recurrence of Lopez's glottic cancer in September 2002 rendered
the AJCC's 5-year survival tables for glottic cancer irrelevant
in determining his likelihood of survival and placed him in a new
statistical category of prognosis. (Tr. 474, 665, 734).[39]

Dr. Fabian, plaintiff's head and neck cancer expert,
opined that since Lopez's recurrence, he has less than a 25%
chance of surviving glottic cancer because once the cancer has
recurred, cancer cells become trapped in scar tissue for long

---

[38] *See* "National Vital Statistics Reports," Vol. 53, No.6, November 6,
2004, Table 12. http://www.cdc.gov.  Plaintiff, in his post-trial submissions,
suggests that his life expectancy, absent his present condition, would have
been 77 years.  (Pl. Post-Trial Brief at 63).  Plaintiff does not cite a
source for this figure.  While the CDC describes the estimated life expectancy
of "both sexes" to be 77.3 years, the estimated life expectancy for males in
the United States is 74.5 years.  Accordingly, I will use the more specific
figure of 74.5 years as a basis for determining Lopez's life expectancy.

[39] According to the AJCC Cancer Staging Handbook, the generally accepted
authority within the profession, if a person is initially diagnosed with Stage
I glottic cancer, he or she has a 65% chance of survival five years after
diagnosis. If a person is initially diagnosed with Stage II cancer, he or she
has a 62% chance of survival after five years.  For Stage III and Stage IV, he
or she has a 54% and 36% chance of survival, respectively. (Tr. 785; Def. Ex.
J1).

periods of time, and the chances of metastasis increase. (Tr. 482-483). In contrast, Dr. Krauss, defendant's head and neck cancer expert, opined within a reasonable degree of medical certainty that Lopez's risk for recurrence is relatively small because 80% of glottic cancer patients will develop a recurrence within the first two years, and Lopez has survived over 27 months since his last treatment without a recurrence of cancer (Tr. 832). Dr. Gensler, defendant's pathology expert, also testified that a recurrence usually occurs in the first two years. Dr. Gensler also explained that if a patient survives five years since his last recurrence with no further disease, then he would be deemed "cured" of glottic cancer. (Tr. 665). However, she testified that after the five year period, patients who have had one head or neck cancer are at greater risk of developing a second head or neck cancer. (Tr. 665). This is due to a phenomenon called the "Condemned Mucosal Theory." Namely, the reason an individual develops head and neck cancer has to do with what that person has been exposed to (e.g. tobacco and alcohol), and how that individual's body handles the exposure. Thus, while Lopez would be "cured" of glottic cancer after a five-year period, whatever combination of exposure and innate tendency led him to develop glottic cancer suggests that all or many parts of his upper aero-digestive tract system are at risk for developing a subsequent cancer. (Tr. 665-66).

Based on the expert testimony at trial, I am persuaded that Lopez, having survived more than two years without a recurrence, is unlikely to develop a further recurrence of glottic cancer. Dr. Fabian's opinion that Lopez's chances for surviving glottic cancer are less than 25% is speculative. However, I am also persuaded that Lopez is at greater risk for developing a second head or neck cancer in his lifetime. Accordingly, I find that Lopez's reasonably certain life expectancy is less than the national average of 74.5 years by approximately ten years. Thus, future damages will be calculated based on a life expectancy of 16 more years.[40]

*Past and Future Earnings*

Plaintiff does not seek an award for the loss of past or future earnings.

---

[40] Plaintiff, in his post-trial submissions, suggests that his reduction in life expectancy entitles him to greater damages for pain and suffering. (Pl. Post-Trial Brief at 70). In support of this claim, plaintiff cites *Carrozza v. Greenbaum,* 866 A.2d 369 (Pa. Super. 2004). In *Carrozza,* a 36 year-old woman brought suit against two doctors whose misreading of several mammograms led to a delay in her diagnosis of breast cancer. This delay in diagnosis diminished her chance of surviving her breast cancer from 95% to 40%. Given the "significant reduction of her life expectancy attributed to the negligence of the Defendants," the trial court denied the defendants' request for remittitur of the $4 million jury verdict in Carrozza's favor. *Id.* at 383. While I find that Lopez's life expectancy is less than the national average, I am not persuaded that this reduction in life expectancy is attributable to the defendant's negligence. While defendant's delay in diagnosis proximately caused plaintiff to undergo a more invasive treatment and the resulting complications, according to the AJCC 5-year survival tables, the delay in diagnosis did not significantly reduce Lopez's likelihood of survival. Lopez's shortened life expectancy, I find, results from the characteristics which made him susceptible to laryngeal cancer in the first place and put him at greater risk for developing other cancers of the upper aero-digestive tract. Even without defendant's delay in diagnosis, Lopez's natural disposition to developing cancer would have caused this reduction in his life expectancy.

*Past Medical Expenses*

Plaintiff's past medical expenses have been paid by Medicaid. Medicaid has asserted a lien of $18,149 against any award in this suit. Plaintiff seeks $18,149 for past medical treatment and expenses, as this is the amount which must be reimbursed to Medicaid. Defendant does not dispute the accuracy of this amount. Accordingly, plaintiff will be awarded past medical expenses in the amount of $18,149.

*Future Medical Expenses*

Both parties' experts testified that Lopez will continue to need medical treatment in the future. Future medical costs will include those associated with care and maintenance of the tracheotomy tube (e.g. continued supplies, suction machinery, medicine), routine oncological care and follow-up examinations, including physical examinations of the head and neck and x-rays. Biopsies will be required only if the examinations and x-rays show evidence of a recurrence. (Tr. 487-90, Tr. 833-84). Dr. Fabian, plaintiff's head and neck cancer expert, also testified that plaintiff should have two formal laryngoscopies a year in an operating room. (Tr. 492).

At trial, neither party provided testimony regarding the specific costs of each of these future medical treatments. However, Dr. Fabian testified that "in general," he expected the kind of treatment Lopez received at Mt. Sinai Hospital to

continue for the remainder of his life. (Tr. 489). Plaintiff, in
his post-trial submissions, provides an itemized list of his past
medical expenses at Mt. Sinai hospital from August 2003 to May
2004, which totals $28,145. Plaintiff submits this list as a
likely approximation of his yearly future medical costs.
Defendant does not object to the fact that this list was
submitted post-trial. However, defendant argues that plaintiff's
estimates of future medical costs are speculative. For the
reasons discussed below, I find that some of plaintiff's
estimates are speculative and do not provide a reasonable basis
for calculation.

Plaintiff's itemized list of past medical expenses
provides information only as to the hospital admission date and
the amount charged for that visit, not the procedures performed.
While the majority of hospital visits appear to be routine office
visits costing between $200 to $600, the hospital visits on
"10/16/03" and "4/8/04" cost in excess of $10,000, without an
explanation of the nature of the visit. Given their cost in
relation to the other visits, I presume that these two visits
involved either a surgical procedure, such as a biopsy, or
extensive testing. Given the evidence at trial, I am unable to
conclude that plaintiff will require two hospital visits per year
at a cost in excess of $10,000. I find instead that $18,000
represents a more likely approximation of plaintiff's future

yearly medical costs.

Plaintiff also asserts that he is entitled to $75,000, representing the cost of undergoing a total laryngectomy. However, I am not persuaded that the plaintiff is likely to undergo a full laryngectomy in the future. The testimony presented at trial on the issue was inconclusive. Dr. Fabian testified that if Lopez was one of his patients, he would recommend a total laryngectomy for "life style" reasons, such as improvement of the swallowing mechanism. (Tr. 478). However, Dr. Kraus testified that while Lopez could elect to have a total laryngectomy in the future, such a procedure would carry significant risks, including a two to five percent risk of post operative death. (Tr. 831). In addition, there was no evidence presented at trial that in light of the potential complications, Lopez would elect to undergo this procedure in the future. Given the inconclusive nature of the evidence on this issue, I find it unlikely that Lopez will undergo a total laryngectomy in the future. The basis for such an award would be speculative at best. Accordingly, plaintiff is awarded $288,000 for future medical costs.[41]

### Pain and Suffering

The final element of damages to be awarded is

---

[41] I arrive at this figure by multiplying $18,000, plaintiff's expected yearly medical costs, by 16, the number of years I expect plaintiff is likely to survive.

compensation for past, present and future pain and suffering.
Under Pennsylvania Law, such an award should include
"compensation for a plaintiff's physical pain and suffering as
well as for any mental anguish, inconvenience, disfigurement,
humiliation and loss of enjoyment of life." *McDonald,* 555 F.Supp
at 971; *Funston v. United States,* 513 F.Supp. 1000, 1010-11
(D.C.Pa.1981). Elements which may enter an award for loss of
enjoyment of life include the "inability to engage in
recreational, religious and household activities." *Yosuf,* 642
F.Supp. at 439. Pennsylvania courts also permit consideration of
evidence of increased risk and/or fear of recurrence of cancer in
awarding damages for pain and suffering. *See e.g. Zieber v.
Bogert,* 565 Pa. 376, 381 (2001); *Carrozza v. Greenbaum,* 866 A.2d
369, 383, n.18 (Pa. Super. 2004). "There is, of course, no
formula that a trier of fact can apply to determine the amount of
an award for pain and suffering," *Id.* "[I]n this process,
systematic logic is not helpful and precision is not achievable."
*McDonald,* 555 F.Supp at 971.

Ample evidence was presented at trial regarding Lopez's
past, present and future pain and suffering. Lopez has suffered
much physical pain, including the prolonged worsening of his
throat-related symptoms while in prison, and the pain and
inconvenience associated with multiple surgical procedures,
hospitalizations, and chemotherapy treatments. Lopez has

suffered significant disfigurement, including the loss of half of his larynx and the permanent insertion of tracheotomy tube in his neck. The tracheotomy tube causes him pain and inconvenience, frequent coughing, irritation and inflamation of the neck, and requires constant maintenance. Moreover, as a result of his disfigurement, Lopez credibly feels embarrassment when interacting with others. His condition causes him mental anguish, including depression and a continuing fear of cancer recurrence. Moreover, his ability to enjoy life has been significantly reduced. He has lost his natural speaking voice, and his diminished speaking capacity interferes with his ability to communicate with others, including his family. He has difficulty eating and drinking, and must anesthesize his throat prior to swallowing. Given the degree of Lopez's physical pain and suffering, mental anguish, inconvenience, disfigurement, humiliation and loss of enjoyment of life, I find that fair and adequate compensation for past pain and suffering is $400,000 and for future pain and suffering, $450,000, for an award of $850,000.[42]

---

[42] This amount is in a range of awards made by other fact-finders in factually similar cases. In *Zacchi v. The State of New York,* Claim No. 102853 (N.Y.Ct.Cl.2003)(unpublished opinion), a prison's medical staff failed to timely refer Ronald Zacchi to an ENT, leading to a delay in diagnosis of laryngeal cancer and a subsequent laryngectomy. The court in *Zacchi* awarded the claimant, who was 56 years old at the time of trial, $400,000 for past pain and suffering and $400,000 for future pain and suffering, based on a finding that Zacchi's injury had caused disfigurement and significantly interfered with his ability to communicate with others. In *Romero v. United States,* 865 F.Supp. 585, 592 (E.D.Mo.1994), the court found that physicians at a Veterans Administration Hospital had committed multiple acts of malpractice,

Accordingly, I find that Lopez is entitled to a total damage award of $1,156,149.

<u>Conclusion</u>

For the foregoing reasons, the plaintiff, Hernando-Franco Lopez, is entitled to judgment against the defendant, the United States of America, in the total amount of $1,156,149. The plaintiff is directed to settle on notice a final judgment consistent with this decision. The Clerk is directed to furnish a filed copy of the within to all parties.


    SO ORDERED.

Dated:    Brooklyn, New York
          August 26, 2005


          By: <u>/s/ Charles P. Sifton (electronically signed)</u>
              United States District Judge

---

including improper reading of a biopsy specimen, which led to the improper diagnosis of squamous cell carcinoma of the plaintiff's larynx, and multiple unnecessary procedures, including a total laryngectomy. As a result, Romero, 72 years old at the time of trial, could only breathe through a hole in his neck and could speak only with use of an electrolarynx. The court awarded him $500,000 for past pain and suffering and $100,000 for future pain and suffering. *Id.* at 590. In *Estate of Vlahos v. Bridgeport Family Medical Center,* 1995 WL 1086318 (Jury Verdict Rep. No. 361,734)(Unreported State Ct., Nov. 1995), plaintiff was awarded a total jury verdict of $1,065,371, to compensate for defendant's misdiagnosis of patient's laryngeal cancer as sore throat. In *Capaccio v. Wasniewski,* No. 4050 (Philadelphia Ct. Com. Pl., 1995), the jury awarded plaintiff $1,000,000 pain and suffering upon finding a physician liable for failure to diagnose a tumor in the left ear canal, despite patient's repeated complaints of ear pain and ear drainage. The delay in diagnosis was found to have unreasonably increased the risk of harm from the cancer.